The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR11-27 RAJ |
| Plaintiff, ) | |
| ) | **GOVERNMENT'S SENTENCING** |
| v. ) | **MEMORANDUM** |
| ) | |
| CLAUDIU TUDOR, ) | |
| ) | |
| Defendant. ) | |
| ) | |

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Steven T. Masada, Assistant United States Attorney for said District, files this Sentencing Memorandum in the above-captioned matter. The sentencing hearing is scheduled for Friday, July 8, 2011.

## I.  INTRODUCTION

In the matter of a few weeks, CLAUDIU TUDOR, a/k/a Claudio Tudor, and his co-defendant Ovidiu Mateescu stole over two hundred thousands dollars from the bank accounts of over a hundred individual victims. These individual victims are ordinary bank and credit union customers who had the misfortune of using an Automated Teller Machine ("ATM") at the "wrong" place and time—namely, an ATM that the defendants had compromised through "skimming activity." Still more troubling is that the aforementioned figures only represent a narrow snapshot of the defendant's actual, prolonged criminal activity, as the investigations conducted by local and federal law enforcement suggest that TUDOR has been involved in this

1    type of conduct for some time, dating back to at least April 2010, causing further losses to an

2    unknown number of additional victims.

3         Both defendants were arrested on the evening of November 6, 2010, after surveillance

4    teams observed TUDOR and Mateescu, along with a third individual, engaging in skimming-

5    related activity at multiple ATMs.  The arrest occurred at a motel where investigating officers

6    later discovered in a room rented by TUDOR various tools and devices used in a skimming

7    operation, numerous fake travel documents, and proceeds of fraudulent transactions, among

8    other things.

9         The defendants were charged federally in a 10-count Indictment.  Dkt_20.  On April 20,

10   2011, Tudor entered pleas of guilty to counts of Bank Fraud, Conspiracy to Commit Access

11   Device Fraud, and Aggravated Identity Theft, as charged in Counts Three, Five, and Ten,

12   respectively.  As part of the plea agreement, the parties agreed to an aggregate sentencing range

13   of between 57 and 65 months.  Dkt_40 ("Plea Agreement") at ¶ 10.  For the reasons stated

14   herein, the United States respectfully recommends that this Court impose a custodial sentence of

15   65 months, to be followed by five (5) years of supervised release subject to the conditions

16   recommended by the U.S. Probation Office.  The United States further requests orders of

17   restitution and forfeiture.

## II.  BACKGROUND

19        This case arises from a United States Secret Service ("USSS") Electronic Crimes Task

20   Force investigation into a rising frequency of skimming activity at ATMs in Western

21   Washington.  Generally speaking, a skimming operation occurs in three stages: (1) suspects affix

22   to an ATM a skimming device and a small camera, which secretly captures ATM customers'

23   account data, namely, the track data on the cards' magnetic strip and customers' personal

24   identification numbers ("PINs"); (2) suspects organize and re-encode stolen customer data onto

25   new cards—thus, making counterfeit cards; and (3) suspects use the counterfeit cards and stolen

26   customer PINs to access funds in victims' accounts.

27        Through this investigation, law enforcement identified CLAUDIU TUDOR and his co-

28   defendant Ovidiu Mateescu as suspects actively engaging in skimming activity and identity theft

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 2
No. CR11-27 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  in the Seattle/Bellevue area.  TUDOR, age 37, is a naturalized United States citizen, having

2  immigrated from Romania to the greater Seattle area almost 25 years ago.

3  **A.    ATM Skimming Operations, Generally**

4  Credit/debit card "skimming" is the theft of credit/debit card information used in an

5  otherwise legitimate transaction.  Among other skimming techniques, suspects often target ATM

6  machines.  Typically, suspects will conceal an electronic card reader inside a piece of plastic

7  manufactured to fit discretely over the card reader portion of an ATM.  This small device (i.e., a

8  "skimmer" or "skimming device") will store the information, or track data, of an unsuspecting

9  victim's bank card.  Suspects place the plastic device over the actual ATM card reader portal and

10 intercept account information as the bank card passes through the device.  Skimmers are

11 equipped to hold hundreds or potentially thousands of card numbers.  Most skimmers have an

12 integrated USB port, which allows data captured on the skimmer to be downloaded onto a laptop

13 or desktop computer.

14 In conjunction with these skimming devices, suspects will routinely install a small "pin-

15 hole" camera above or to the side of the ATM key pad using tape, glue, or other adhesive

16 materials.  These cameras are intended to capture the PINs entered by unsuspecting ATM

17 customers.  The skimming devices are synchronized with the cameras, which enables the

18 suspects to match a victim's PIN with the magnetic track data taken from the bank card.

19 After a period of time, suspects will retrieve their devices from the ATM and download

20 the "skimmed" bank account data onto a computer.  Suspects will then transfer or re-encode

21 victim bank account information onto blank card stock, also known as "white plastic."  Suspects

22 have been known to re-encode stolen bank account data onto store gift cards and other cards

23 bearing a magnetic strip.  Simply stated, they create counterfeit cards.

24 Once this process is complete, suspects use the counterfeit cards and the corresponding

25 PINs to access funds in victims' bank accounts, typically through ATM cash withdrawals and

26 point-of-sale purchases.  These withdrawals are sometimes referred to as "cashouts."  As is the

27 case here, fraudulent transactions frequently will occur quite rapidly and the accumulated losses

28 will be substantial.

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 3
No. CR11-27 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**B.    Offense Conduct**

The USSS investigation uncovered substantial evidence establishing CLAUDIU TUDOR's involvement in skimming activity, as described above, dating back to at least mid-2010.  TUDOR, along with his co-defendant Ovidiu Mateescu, have participated in the skims of various ATMs, the creation of counterfeit cards, and the unauthorized withdrawal of funds from well over one hundred skimmed customer accounts.

*1.    Skimming Activity*

Continuing up until November 6, 2010, the date of his arrest, TUDOR was an active ATM skimmer, who caught the attention of local and federal law enforcement.  Both Mateescu and TUDOR were identified together placing skimming devices and pin-hole cameras on the ATMs of several financial institutions, including Key Bank, Wells Fargo, and Boeing Employee's Credit Union ("BECU"), in Western Washington.  The following summarizes the skimming incidents in which the defendants have been identified:

| Date | Financial Institution (ATM Location) |
|------|--------------------------------------|
| July 24, 2010 | Key Bank (Holman Road) |
| July 25, 2010 Aug. 1, 2010 | Wells Fargo (Bridle Trails/Kirkland) |
| Sept. 16, 2010 Sept. 17, 2010 Sept. 19, 2010 Sept. 21, 2010 | BECU (Renton) |
| Sept. 23, 2010 | BECU (Woodinville) |
| Sept. 25, 2010 to Oct. 3, 2010 | Wells Fargo (Juanita Village/Kirkland) |
| Nov. 6, 2010 | BECU (Puyallup) |

Through this and other skimming activity,[1] the defendants were able to covertly gather ATM users' account information and PINs—i.e., "access devices" as defined by 18 U.S.C. § 1029(c).

---

[1] As noted by the Probation Office, TUDOR also has been linked to additional skimming activity in California and Washington.  *See* Recommendation at 5.  For instance, in April 2010, TUDOR used a card number skimmed from a Chase Bank ATM in Mt. Vernon to make purchases at a Wal-Mart store.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Both Mateescu and TUDOR were involved in an attempted skim on September 23, 2010, at a BECU ATM located in Woodinville.  On that date, deputies with the King County Sheriff's Office responded to a citizen's complaint regarding suspicious individuals loitering around an ATM.  Upon arrival at the scene, the deputies initially contacted two men—one of whom was identified as Mateescu—who were allowed to leave the area after being questioned.  Thereafter, the deputies discovered a pin-hole camera and a skimming device affixed to this ATM.  BECU surveillance images from the ATM later confirmed the attempted skim.  Mateescu approaches the ATM, carrying a Wilson tennis racket case, before removing a skimming device and pin-hole camera and affixing both devices to the ATM.  Several minutes later, TUDOR approaches the ATM and checks the affixed devices.  BECU records confirm that no legitimate transactions occurred at the times when the defendants are present at the ATM.  Furthermore, a fingerprint analysis conducted by Bellevue Police Department positively identified TUDOR's fingerprint on the unexposed, underside of the casing of the pin-hole camera.

### 2. *Unauthorized Withdrawals/Cashouts*

Using customer information obtained through the aforementioned skimming activity, TUDOR and Mateescu, and perhaps others, then manufactured counterfeit cards—i.e., counterfeit access devices, as defined by 18 U.S.C. § 1029(c).  They then used those counterfeit cards, along with the similarly stolen PINs, to make numerous withdrawals from various ATMs throughout the Seattle/Bellevue area.  For example, between October 9 and 12, 2010, the defendants initiated hundreds of cash withdrawals from accounts compromised through the skims of the BECU Renton ATM, noted above.  Through its investigation, local and federal law enforcement recovered literally hundreds of surveillance images of the defendants making fraudulent ATM withdrawals.  On these and other dates, the defendants traveled together from ATM to ATM, making a series of sizeable cash withdrawals from numerous customer account.  At times, TUDOR and Mateescu would execute an empty envelope deposit, which is where a person feigns a deposit by inserting an empty envelope into the ATM.  The purpose is to artificially increase the available account balance in order to immediately make a cash withdrawal for which, in actuality, there may be insufficient funds.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

In addition to ATM withdrawals, TUDOR and Mateescu made several large purchases using funds from the victim accounts.  For instance, video surveillance recovered through the investigation shows the defendants purchasing jewelry items from the JCPenney store in Southcenter Mall.  Transaction records and fraud reports confirm that the purchases were made using accounts compromised from skims they committed—in this case, at Wells Fargo ATMs.[2] These jewelry items were later recovered from TUDOR's motel room following his arrest.

## C.      Arrest of Defendants

Motivated by the substantial financial losses caused through skimming activity, including but not limited to the incidents discussed above, a surveillance operation involving local and federal law enforcement took place on November 6, 2010.  As part of this operation, surveillance was established at several locations of interest, including two apartments leased by TUDOR.

That evening, surveillance teams observed TUDOR leave one of the apartments in a GMC sports utility vehicle ("SUV"), later determined to be a rental vehicle.  He drove to the Extended Stay Motel located in Renton, where TUDOR met two others—namely, Ovidiu Mateescu and an unidentified male subject.  A surveillance team then followed TUDOR and his associates to a strip mall in Puyallup, where the subjects attempted to install a skimming device on a BECU ATM machine.  Surveillance footage obtained from BECU shows Mateescu attempting to affix a skimming device to the ATM.  The SUV then traveled to another ATM location in Maple Valley before surveillance was lost.

Local law enforcement again encountered TUDOR and Mateescu later that night back at the Extended Stay Motel in Renton.  Both were arrested.  Mateescu initially presented detectives with a false Romanian identification card and identified himself as Mihai Podaru, an alias.  In addition to cellular telephones, TUDOR and Mateescu had on their persons $1,100 in $100 bills, several debit cards, and a green skimming device.

Officers then asked TUDOR for his room number at the Extended Stay Motel.  TUDOR claimed to not remember, but offered to show officers the room.  TUDOR led a detective

---

[2] The JCPenney jewelry purchases were made using accounts skimmed at the Juanita Village Wells Fargo ATM, noted above.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

through the motel and suddenly began yelling in a foreign language, believed to be Romanian, as they passed Room 106.  Because TUDOR failed to identify his room, officers reviewed the guest registry from the front desk manager, which confirmed that TUDOR was renting Room 106. Officers then checked the outside of motel and discovered the outside window to Room 106 was open and the window screen was pushed out.  The room was cleared to ensure there were no occupants and secured pending a search warrant application for the premises.  The third man previously observed by surveillance teams was never located, nor positively identified.

The following day, officers conducted a warrant search of Room 106 at the Extended Stay Motel.  They discovered items indicative of skimming activity and tools and supplies used to manufacture fictitious identification documents, such as glue, a razor knife, a cutting board, and a roll of plastic sheeting.  Also seized during the search were several laptop computers, an external hard-drive, wireless USB devices, and numerous cell phones.  The search team also located numerous fictitious identification documents, including a Russian Visa, passports and driver's licenses from Sweden and the Republic of Slovakia, and a State of Oregon driver's license.  Each identification document contained Mateescu's picture, but one of several aliases.[3] Finally, officers seized numerous receipts, documents, and recently purchased goods, including jewelry items purchased from JCPenney, mentioned above.  Notably, little cash was recovered; nor did the search team find a stash of counterfeit cards.

A subsequent search of the seized computers and digital devices, conducted pursuant to supplemental search warrants, uncovered financial and account information presumably illicitly obtained through skimming activity.  Some of the digital devices were heavily encrypted.

Officers also executed a search warrant on the GMC SUV driven by TUDOR.  They located and seized additional cellular phones and what is believed to be a genuine Romanian passport and a birth certificate in Mateescu's name hidden in the vehicle's spare tire compartment.

---

[3] Through the investigation, it was discovered that Ovidiu Mateescu had opened several bank accounts using his various aliases.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**D.      Procedural History**

The defendants were arrested on November 6, 2010, and initially charged by the King County Prosecutor's Office.  Federal charges were filed shortly thereafter.  TUDOR made his initial appearance in federal court on December 27, 2010, before the Honorable Brian A. Tsuchida.  In his initial interview, TUDOR represented to Pre-trial Services and the Court that he did not have a valid passport, and claimed no recent international travel or foreign contacts.  Through further investigation, the USSS confirmed that TUDOR's statements were false.  Not only did TUDOR have a valid U.S. passport, he had very recently traveled to Romania (where his father apparently lives) for an extended period of time.  In fact, he had applied for and received a temporary passport at the U.S. embassy after reporting his stolen.  Upon returning to the United States, TUDOR applied for and obtained a valid replacement passport in June 2010. In light of the circumstances, the Court ordered TUDOR detained pending trial.[4]

On January 26, 2011, a federal grand jury returned an Indictment charging Ovidiu Mateescu and CLAUDIU TUDOR with various criminal offenses arising from their skimming activity and identity theft, *United States v. Mateescu et al.*, CR11-27 RAJ.

On April 20, 2011, TUDOR and the United States entered into a plea agreement. TUDOR pled guilty to the offenses of Bank Fraud, in violation of 18 U.S.C. § 1344 (Count Three); Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(b) (Count Five); and Aggravated Identity Theft, in violation of 18 U.S.C. § 1029A (Count Ten).  He now awaits sentencing by this Court.

## III.  SENTENCING RECOMMENDATION

Having considered the factors set forth in 18 U.S.C. § 3553(a) and the Sentencing Guidelines, the United States respectfully recommends a guideline sentence of 41 months on Counts Three and Five, coupled with the mandatory consecutive term of 24 months on Count Ten.  Accordingly, the government's net recommendation is a term of imprisonment of 65

---

[4] Ovidiu Mateescu made his initial appearance in federal court on January 24, 2010, before the Honorable James P. Donohue.  Given the immigration detainer in place, Mateescu, a non-U.S. citizen, stipulated to pre-trial detention.

months, which is at the low-end of the advisory guidelines range, as calculated by the government, to be followed by five (5) years of supervised release subject to the standard and special conditions set forth in the Probation Office's Sentencing Recommendation.

The United States further seeks a restitution order in the amount of two hundred and twenty-five thousand five hundred ninety-two dollars and twenty-nine cents ($225,592.29), which should be paid as directed by the Probation Office.  Finally, the United States seeks an order of forfeiture, as set forth in the parties' plea agreement.

## IV.  DISCUSSION

In fashioning an appropriate sentence, the district court must consider both the United States Sentencing Guidelines ("USSG"), which are advisory post-*United States v. Booker*, 543 U.S. 220 (2005), as well as the factors set forth in 18 U.S.C. § 3553(a).  The sentence recommended by the government adequately accounts for all such considerations, as set forth below.

**A.    Sentencing Guidelines Calculation**

**1.    *Advisory Sentencing Range***

The United States has reviewed the Sentencing Guidelines calculations set forth in the Presentence Report ("PSR") prepared by the Probation Office.  TUDOR has no countable prior criminal convictions and therefore falls within Criminal History Category (CHC) of I.  The United States submits that the total offense level with respect to Counts Three and Five is 22, calculated as follows:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss Amount (more than $200,000) | +12 | USSG § 2B1.1(b)(1) |
| Number of Victims (more than 50) | +4 | USSG § 2B1.1(b)(2) |
| Obstruction of Justice | +2 | USSG § 3C1.1 |
| Acceptance of Responsibility | −3 | USSG § 3E1.1 |
| **Total Offense Level:** | **22** | |

Accordingly, with a total offense level of 22 and a CHC of I, TUDOR has a guidelines range of imprisonment of 41 to 51 months on Counts Three and Five, plus an additional 24-month

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 9
No. CR11-27 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    consecutive term on Count Ten.[5]  *See* USSG § 2B1.6.  Thus, the effective range of imprisonment

2    for his crimes of conviction is, in the government's calculation, 65 to 75 months.[6]

3         The parties, however, have agreed to a sentencing range of 57 to 65 months.  *See* Plea

4    Agreement at ¶ 10.  Pursuant to the plea agreement, both the United States and the defendant

5    will recommend a term of imprisonment within this stipulated range.

6         ***2.    Offense Level Adjustments***

7         The parties have stipulated to the application of enhancements for loss amount (+12) and

8    the number of victim (+4), pursuant to USSG § 2B1.1(b)(1) and (2), respectively.[7]  *See* Plea

9    Agreement at ¶ 7.  Further, as discussed below, the government acknowledges a three-level

10   reduction for the defendant's acceptance of responsibility under USSG § 3E1.1.  The only

11   offense level adjustment in dispute is the application of the 2-level Obstruction of Justice

12   enhancement of USSG § 3C1.1, which was not applied in the Probation Office's

13   recommendation.

14        a.    **Obstruction of Justice (+2)**

15        The United States contends that the Sentencing Guidelines plainly instruct the application

16   of a 2-level increase to the offense level in circumstances such as those present here.  In

17   particular, section 3C1.1 directs as follows:

18   _____

19        [5] The Sentencing Guidelines do not authorize a sentence of probation for a range within
     Zone D of the Sentencing Table, as is the case here.  *See* USSG § 5B1.1, Application Note 2.

20

21        [6] If the Court concludes that the disputed Obstruction of Justice enhancement does not
     apply, then the total offense level would be 20.  Accordingly, the guidelines range of
22   imprisonment would be 33 to 41 months, plus the additional 24 months, for an aggregate range
     of 57 to 65 months.  Either way, the sentencing recommendation of the United States falls within
23   the advisory range of imprisonment.  In any event, however the Court ultimately calculates the
     guidelines range, the United States asserts that a 65-month custodial sentence is appropriate
24   upon application of the § 3553(a) factors.

25        [7] To be clear, as part of the plea agreement, the United States stipulated to enhancements
     for Sentencing Guidelines purposes based upon the *known actual* loss and victims attributable to
26   the defendants at the time.  The actual loss caused by this conduct and the actual number of
     victims is unknown and may well exceed these current figures.  Furthermore, the "loss" used to
27   calculate the Guidelines sentencing range ordinarily includes all "intended loss."  USSG
     § 2B1.1, Application Note 3.  Thus, by definition, each attempted withdrawal could operate to
28   enhance the loss figure attributable to TUDOR in calculating the applicable Guidelines range.
     The government is expressly not pursuing this course here.

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1.  Notably, whether the defendant's conduct actually obstructed or impeded the administration of justice is immaterial, as the enhancement applies even where a defendant "attempted to obstruct or impede" an investigation or prosecution.  *See United States v. Solano-Godines*, 120 F.3d 957, 963 (9th Cir. 1997) (noting that the enhancement applies "regardless of whether it actually resulted in a significant hindrance to the investigation or prosecution").  In other words, under these circumstances, the enhancement applies even if, in hindsight, the defendant's obstructive behavior did not actually "cause[] a material hindrance to the official investigation or prosecution," PSR ¶ 43—i.e., the Probation Office's core rationale for not applying the enhancement here.  As stated in the presentence report, TUDOR's conduct and dishonesty following arrest were egregious and, in the government's view, are precisely the type of behavior the Sentencing Commission contemplated when providing for the Obstruction of Justice enhancement.

First, TUDOR blatantly misled the pre-trial officer, and ultimately the Court, regarding facts of consequence.  PSR ¶ 44.  In addition to failing to disclose an apartment residence and the existence of a dependant child,[8] TUDOR represented that he had no recent international travel, no foreign contacts, and no passport or other travel documents in his initial interview with Pre-trial Services on December 28, 2010.  *Id.*; Dkt_6.  This information was incorporated into the pre-trial officer's initial recommendation, which was "release" pending trial.  Before the detention hearing, held on December 30, 2010, law enforcement sought to verify TUDOR's statements.  All proved false.  Not only did TUDOR have a valid U.S. passport, he had traveled to Romania and elsewhere within the previous 12 months.  In fact, TUDOR stayed in Romania for months the prior winter.  While there, TUDOR reported his passport stolen and obtained a temporary replacement passport from the U.S. embassy in Bucharest.  Then, upon returning to

---

[8] In preparation of the presentence report, it was discovered that TUDOR actually has two children.

the United States, TUDOR applied for and received a permanent U.S. passport in about June 2010—i.e., during the period he was engaged in criminal conduct. The whereabouts of his prior passport, which he reported stolen, remain unknown. Based on the true facts, Pre-trial Services changed its recommendation to "detention" pending trial, noting a perceived risk of non-appearance, coupled with a risk of danger to the community.

Dishonesty regarding a material matter to the pre-trial officer and to the Court readily constitutes obstructive behavior, as contemplated by § 3C1.1 of the Sentencing Guidelines. Indeed, the Sentencing Commission included in a "non-exhaustive list of examples of the types of conduct to which this adjustment applies" the "providing materially false information to a judge or magistrate judge" as well as "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." USSG § 3C1.1, Application Note 4. There can be no legitimate dispute that the false information was material. A "material" fact, statement, or information refers to any fact, statement, or information "that, if believed, would tend to influence or affect the issue under determination." *Id.*, Application Note 6. TUDOR's false statements were intended to affect Pre-trial Services and the Court's determination regarding pre-trial detention or release and, if the latter, the conditions thereof. Here, the probation officer flipped her recommendation upon learning the truth. Moreover, there is only one logical reason someone in TUDOR's position would provide false information about international travel, foreign connections, and the possession of a valid passport. He contemplated fleeing to avoid criminal prosecution. And, there can be no dispute that flight thwarts prosecution. This was not simply a misunderstanding or a modest misstatement, but rather a calculated, obstructive measure.

The instant determination is controlled by established Ninth Circuit precedent. False statements and documents presented to judges, magistrate judges, probation officers, and pretrial services officers need not impede investigation or prosecution to support an increase to the base offense level for obstruction of justice. *See Solano-Godines*, 120 F.3d at 963 (contrasting a defendant's false statements provided to law enforcement officers). In *United States v. Magana-Guerrero*, 80 F.3d 398 (9th Cir. 1996), the Court concluded that the defendant's lies to

a pre-trial services officer regarding a topic material to a bail determination (i.e., prior

convictions) justified application of the obstruction of justice enhancement.  The court reasoned:

> Providing materially false information to a pretrial services officer, whose job it is to
> conduct investigations for the court, constitutes obstruction of justice for purposes of
> section 3C1.1, without a specific showing that the falsehood actually obstructed justice.
> Magana provided materially false information to a pretrial services officer who was
> conducting a bail investigation for the district court.  Accordingly, Magana obstructed
> justice for purposes of section 3C1.1.

*Id.* at 401 (internal citations omitted).  Moreover, in reaching this holding, the Court specifically

rejected the defendant's contention that his lies did not amount to obstruction of justice because

his deception was easily discovered, noting that his false statements, if believed, "could have

influenced matters such as his entitlement to bail or his sentence."  *Id.* at 400.[9]

In sum, TUDOR's material misstatements to the pre-trial officer, which plainly were

intended to influence the detention determination, constitute obstructive conduct contemplated

by the Sentencing Guidelines.  Indeed, courts have found less egregious misrepresentations

worthy of the enhancement.  *See*, *e.g.*, *United States v. Thomas*, 86 F.3d 263, 264 (1st Cir. 1996)

(holding that the "defendant's use of a false identity in the hope of being released on bail is an

obstruction of justice"); *United States v. Romulus*, 949 F.2d 713, 717 (4th Cir. 1991) (affirming

application of obstruction of justice enhancement based on the defendant's false statements

intended "to prevent authorities from determining his true identity and age in order to gain an

unwarranted release from [pre-trial] custody constituted willful obstruction of justice").

The Court should also conclude that TUDOR's conduct at the Extended Stay motel

following (and not contemporaneous to) his arrest independently justifies application of the

obstruction enhancement.  PSR ¶ 41.  After he and Mateescu were placed under arrest, TUDOR

---

[9] *Magana-Guerro* is a case decided prior to the November 1, 1998 amendments, which
added clause (B) to USSG § 3C1.1.  Again, Ninth Circuit precedent makes clear that this is of no
consequence.  The Sentencing Commission amended USSG § 3C1.1 to resolve a then-existing
circuit split regarding the scope of obstructive conduct and, in doing so, adopted the broad view
of the guideline taken by the majority of circuits, including the Ninth.  *See United States v.
Verdin*, 243 F.3d 1174, 1180 (9th Cir. 2001).  It is well established that the addition of clause (B)
operated only to expand the types of conduct warranting the enhancement.  *Id.*; *accord United
States v. Jones*, 308 F.3d 425, 429–30 (4th Cir. 2002) (rejecting "the argument that the addition
of clause (B) rendered § 3C1.1 more rigorous and have instead construed the amendment as
expanding the types of obstructive conduct warranting an enhancement").

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 13
No. CR11-27 RAJ

was asked by officers which room was his.  TUDOR could have remained silent but instead offered to show them, claiming he could not remember the room number.  Upon passing Room 106, later determined to be TUDOR's room, TUDOR began yelling in a foreign language, presumably, Romanian, his native language.  After a motel clerk confirmed TUDOR's room, officers outside the motel discovered the room's window open and the screen pushed out.  Officers on the scene surmised that TUDOR, by yelling in the hallway, had alerted another person inside the room, presumably, the third male seen with TUDOR and Mateescu earlier that evening, of police presence.  That individual presumably fled through the window to avoid apprehension.

It is the government's position that this behavior falls squarely within the purview of USSG § 3C1.1.  The Probation Office's reasoning to the contrary runs afoul of the guideline itself and the case law interpreting it.  *See* PSR ¶ 43.  For instance, whether or not evidence was actually removed from the room is not determinative.[10]  Nor is, under these circumstances, uncertainty about whether TUDOR's conduct actually "caused a material hindrance to the official investigation or prosecution."  *Id.*  In fact, it is not necessary that any person was actually inside Room 106 to hear TUDOR's warning.  Rather, as stated above, it is only significant that TUDOR, by his conduct, attempted to impede or obstruct the administration of justice.  Finally, the obstruction enhancement directs a 2-level enhancement when a defendant engages in obstructive behavior.  There is no limitation, as implied by the Probation Office's reasoning, that the conduct must affect the government's investigation or prosecution of this defendant.  Attempting to assist the flight of a suspect and/or material witness impedes the administration of justice.  It not only operates to "destroy or conceal evidence" relevant to the prosecution of TUDOR, *see* USSG 3C1.1, Application Note 4, it also obstructs the government's ability to apprehend and possibly prosecute a co-conspirator.  The materiality of TUDOR's conduct upon

---

[10] The presentence report states that it is not known what items, if any, were removed from the room.  On this point, the government notes that "evidence" encompasses more than physical evidence and includes, for instance, witness testimony.  Moreover, there is a logical misstep in requiring evidence of what evidence actually was removed, concealed, or destroyed.  The proper inquiry targets the motivations of the defendant's conduct.

1    an official investigation and prosecution is, in the government's view, well established.

2         For either or both of the grounds stated above, the Court should apply a 2-level

3    adjustment to TUDOR's offense level, pursuant to USSG § 3C1.1.

4                        **b.**      **Acceptance of Responsibility (–3)**

5         The United States agrees that TUDOR has sufficiently accepted responsibility for his

6    criminal conduct and therefore qualifies for the two-level reduction pursuant to USSG

7    § 3E1.1(a).  Further, TUDOR pled guilty in a timely manner that allowed the United States to

8    avoid preparing for trial and permitted the Court to allocate its resources efficiently.  Thus, the

9    United States moves for the additional one-point reduction available under USSG § 3E1.1(b).

10   **B.   Section 3553(a) Factors**

11        As the Ninth Circuit and the Supreme Court have made clear, the sentencing guidelines

12   are "the 'starting point and the initial benchmark' . . . and are to be kept in mind throughout the

13   process." *United States v. Carty*, 520 F.3d 984, 996 (9th Cir. 2008) (en banc) (citations to

14   *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),

15   omitted).  Title 18, United States Code, Section 3553(a), sets forth factors for the Court to

16   consider along side the advisory guidelines range.  Nevertheless, "in the ordinary case, the

17   Commission's recommendation of a sentencing range will 'reflect a rough approximation of

18   sentences that might achieve § 3553(a)'s objectives.'" *Id.* at 996 (quoting *Kimbrough*, 552 U.S.

19   at 109).

20        The most compelling factor warranting a sentence of some significance is the nature and

21   characteristics of the offense.  *See* 18 U.S.C. § 3553(a)(1).  The offense indiscriminately targets

22   ordinary people.  Indeed, any person who uses the ATM is a potential unwitting victim of this

23   fraud scheme.  As seen by the offense conduct here, within a matter of days, TUDOR and his

24   associates drained victims' accounts.  The violative and invasive nature of assuming one's

25   identity, even be it at an ATM, is also aggravating and affects victims in ways that cannot be

26   financially quantified.  Moreover, in these turbulent economic times, the public trust in financial

27   institutions is perhaps at an all-time nadir.  Conduct such as TUDOR, driven solely for personal

28   gain, only contributes to the sentiment.

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 15
No. CR11-27 RAJ

1    The amount of loss is stifling, especially when considering how quickly it can

2    accumulate.  From the skims of the Renton BECU ATM alone, TUDOR and Mateescu made off

3    with over $170,000 in cash—i.e., the *actual* loss suffered by BECU and approximately 55

4    individual customers.  Similarly, from a single skim of an ATM in Juanita Village, Wells Fargo

5    and its customers suffered about $50,000 in fraud.

6    In fashioning a sentence, the Court also should take into account the sophistication of the

7    criminal activity here.  The skimming scheme requires specialized knowledge and planning.

8    Indeed, the equipment needed for the operation—e.g., skimming devices and pin-hole cameras

9    fabricated to be concealed on the face of ATMs, blank card stock, computers and other

10   electronic devices, such as card encoders—demonstrates this point.  Skimming is not a crime of

11   opportunity, but rather a calculated, methodical assault on the average account holder and on the

12   American banking system in general—one motivated purely by greed.

13   The Court must also consider the history and characteristics of the defendant.  *See* 18

14   U.S.C. § 3553(a)(1).  TUDOR lacks any significant criminal history.  This mitigating factor

15   should, however, be tempered by the litany of aggravating circumstances identified by the

16   Probation Office in its presentence report and recommendation.  It is unknown how long

17   TUDOR has been engaged in such fraud and, what is more, there is little indication that he

18   intended to stop or reform his ways.  Only his arrest ceased his criminal activity.   Beyond that,

19   much of what the government knows about TUDOR comes from him and from sources who, in

20   the probation officer's view, are not intimately familiar with his dealings.  *See* Recommendation

21   at 5.  And, to say that TUDOR was not forthcoming with the Court and the Office of Probation

22   and Pre-trial Services would be a gross understatement.  The reasons stated above in support of

23   the obstruction enhancement apply with equal, if not more, force under the § 3553(a) analysis.

24   The sentence imposed should be severe enough to promote respect for the law, to provide

25   just punishment, and to deter such criminal conduct.  *See* 18 U.S.C. § 3553(a)(2).  The financial

26   incentives of engaging in such criminal activity are apparent and, as evidenced here, potentially

27   quite lucrative.  The total restitution amount in this case, $225,592.29, is limited to TUDOR's

28   skimming activity and cashouts over about a 30-day period.  The actual losses attributable to

GOVERNMENT'S SENTENCING MEMORANDUM/Tudor - 16
No. CR11-27 RAJ

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

TUDOR are unknown, but are almost certainly much more significant.  For some time, TUDOR essentially used the checking and savings accounts of unwitting ATM customers as his personal piggy bank.  As set forth in the presentence report, TUDOR has no verifiable work history since September 1998, when he was involuntarily terminated from Coca-Cola Refreshments.  PSR ¶¶ 109–117.  Moreover, his representations to the probation officer regarding his finances remain questionable, at best.  Despite having no identifiable source of income, TUDOR rented a second apartment (the one not reported to Pre-trial Services), paid monthly child support (for a child not reported to Pre-trial Services), and financed his own lifestyle.  His claim that he received funds from his mother should be viewed with great skepticism given her fixed income, as articulated by the Probation Office.  *See* Recommendation at 5.

Having immigrated to the United States over 20 years ago and gained his citizenship, TUDOR has had access to opportunities that so many others hunger for.  And, as demonstrated by the nature of his scheme, it is apparent that TUDOR is capable of being a productive member of society.  It is unfortunate that he was drawn by greed and elected to use his skills to profit through illegal, as opposed to legal, activity.  Hopefully, this encounter with the criminal justice system will serve as a turning point and, after serving his sentence, he will channel his efforts toward lawful ventures and find fulfillment as a law-abiding citizen.

**C.      Restitution**

The defendant has agreed to make full restitution to the financial institutions and other victims of his conspiracy and scheme to defraud in an amount of no less than $230,625.35.  Plea Agreement at ¶ 9.  After further accounting, the parties agree that the appropriate amount of restitution based on currently known loss is two hundred and twenty-five thousand five hundred ninety-two dollars and twenty-nine cents ($225,592.29).  The United States requests the Court impose restitution in that amount payable to his victims, as directed by the Probation Office.  *See* PSR ¶¶ 133–134.

**D.      Forfeiture**

The United States further requests an order of forfeiture, as set forth in the parties' plea agreement.  Plea Agreement at ¶¶ 11–12.  An order of forfeiture with be presented at the

1  sentencing hearing.

2  **V.  CONCLUSION**

3      For the reasons set forth above, the United States recommends that this Court impose a

4  sentence as set forth above, and further requests an order of forfeiture.

5      DATED this 1st day of July, 2011

6

7                                    Respectfully submitted,

8                                    JENNY A. DURKAN
   United States Attorney

9

   *s/Steven T. Masada*
10  STEVEN T. MASADA
   Assistant United States Attorney
11  700 Stewart Street, Suite 5220
   Seattle, WA 98101-1271
12  Telephone:   (206) 553-4282
   Fax:            (206) 553-0755
13  E-mail:        steven.masada@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on July 1, 2011, I electronically filed the foregoing with the Clerk of

3  Court using the CM/ECF system which will send notification of such filing to the attorney(s) of

4  record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the

5  defendant(s) that are non CM/ECF participants via telefax.

6

7                                                              *s/Steven T. Masada*
                                                             STEVEN T. MASADA
8                                                            Assistant United States Attorney
                                                             700 Stewart Street, Suite 5220
9                                                            Seattle, WA 98101-1271
                                                             Telephone:     (206) 553-4282
10                                                           Fax:           (206) 553-0755
                                                             E-mail:        steven.masada@usdoj.gov
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Certificate of Service - 19